IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| THE BOARD OF TRUSTEES OF CARPENTERS FRINGE BENEFIT FUNDS OF ILLINOIS by ANGELICA B. AMBROSE, ADMINISTRATIVE MANAGER,<br><br>    Plaintiff,<br><br>vs.<br><br>SOUTHSIDE CONCRETE, INC.,<br><br>    Defendant. | No. C13-1016<br><br>RULING |

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   Custom Concrete Designs, Inc. . . . . . . . . . . . . . . . . . . . 3
    C.   Southside Concrete, Inc. . . . . . . . . . . . . . . . . . . . . . . 4
    D.   First Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    E.   Contributions to the Funds . . . . . . . . . . . . . . . . . . . . 6
    F.   Compliance Examination . . . . . . . . . . . . . . . . . . . . . . 6

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    A.   Is Southside the Alter Ego of Custom? . . . . . . . . . . . . . . 12
    B.   What Amount is Owed By Custom? . . . . . . . . . . . . . . . 16

V.    RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## I. INTRODUCTION

On the 21st day of July 2014, this matter came on for trial on the Complaint (docket number 1) filed by the Plaintiff on May 13, 2013. The Plaintiff Board of Trustees was represented by its attorneys, Michael W. Halpin and Timothy M. Feeney. Defendant Southside Concrete, Inc. was represented by its Vice-President, Scott McAtee, and its attorney, Francis Wm. Henkels.

## II. PROCEDURAL HISTORY

On May 13, 2013, the Board of Trustees of Carpenters Fringe Benefit Funds of Illinois, acting by its Administrative Manager, Angelica B. Ambrose, filed a complaint against Southside Concrete, Inc., seeking judgment for amounts owed to the Funds by Custom Concrete Designs, Inc., plus interest, attorney fees, and costs. Southside Concrete filed an answer on July 29, denying that it has any responsibility for amounts owed by Custom Concrete, and asking that the case be dismissed.

On October 3, 2013, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, a non-jury trial was scheduled for July 21, 2014. With the Court's permission, Plaintiff filed a post-trial brief on August 25, Defendant filed a post-trial brief on September 29, and Plaintiff filed a reply brief on October 14.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Carpenters Fringe Benefits Funds ("the Funds") includes the Carpenters Pension Fund of Illinois and the Carpenters Retirement Savings Fund of Illinois. The Funds receive contributions from numerous employers pursuant to Collective Bargaining Agreements ("CBAs") between the employers and the Carpenters local unions. It constitutes a "multiemployer plan," as defined in 29 U.S.C. § 1002(37)(A).

2

Non-party Custom Concrete Designs, Inc. ("Custom") entered into a CBA that required it to pay monthly fringe benefit contributions to the Funds. The CBA also bound Custom to the provisions of the "Agreement and Declarations of Trust," which created the Funds. From September 10, 2001, to September 2010 — when it stopped doing business — Custom was an Iowa corporation engaged in the business of concrete construction.[1] Custom was solely owned by Scott McAtee and his wife, Jeni McAtee. Jeni McAtee held the title of President, and Scott McAtee held the title of Vice-President.

Defendant Southside Concrete, Inc. ("Southside") was incorporated on September 7, 2010. Southside, which is solely owned by Scott McAtee and Jeni McAtee, is also engaged in the business of concrete construction. Jeni McAtee is President of Southside and Scott McAtee is Vice-President.

## B. *Custom Concrete Designs, Inc.*

Scott McAtee testified that when Custom was started in 2001, McAtee intended to perform primarily decorative concrete work. McAtee discovered that there was not enough work in that area to sustain a business, however, and he expanded into commercial work. Eventually, Custom specialized in "big commercial work," such as strip malls and multi-story buildings. When it ceased doing business in 2010, Custom was devoting 90% of its time to commercial work, 15% to decorative work, and 5% to residential (apparently "giving 110%"). At its maximum, Custom had 15 to 20 employees.

With the exception of summer help, Custom's employees were members of the Carpenters Union and the Laborers Union. Scott McAtee himself was a member of the Carpenters Union. Under the terms of the CBAs and Trust Agreements, Custom was required to contribute to the Funds when employees were performing "covered work." McAtee testified that whenever a union member was working, it was considered "covered

---

[1] Custom stopped filing reports, and it was administratively dissolved by the Iowa Secretary of State on August 9, 2012.

work." McAtee testified, however, that the non-union employees did not perform "covered work" as defined in the CBAs with the Carpenters Union.

Scott McAtee testified that it was apparent Custom was having financial problems toward the end of 2009 and during 2010. According to McAtee, the economy "turned bad," there was less work, and competitors were submitting lower bids. Toward the middle or latter part of 2010, McAtee realized that Custom could not survive, and he considered his options so he could "feed my family."

McAtee decided to stop doing business as Custom Concrete Designs, Inc., and start doing business as Southside Concrete, Inc. Kevin Phillips, a journeyman carpenter, testified that McAtee "sat us down" and told them of his intentions. Because Southside was not going to be a "union shop," Phillips "chose to stay with the union" and find similar work elsewhere. The parties stipulated that if he were called to testify, Patrick Smith would testify substantially the same as Phillips.

*C. Southside Concrete, Inc.*

Southside was incorporated on September 7, 2010. Scott McAtee met with Tom Johnson, a vice-president for commercial lending at Premier Bank. At that time, Custom owed the bank $203,902.93 on an existing note, secured by a UCC Financing Statement (Plaintiff's Exhibit 4), identifying equipment owned by Custom.[2] It was agreed that Premier would lend Southside $203,902.93, which would be used to pay the existing note owed by Custom. That is, Southside would effectively be substituted for Custom on the promissory note owed to the bank.

On December 9, 2010, Southside ostensibly purchased all of Custom's equipment. According to the Bill of Sale (Plaintiff's Exhibit 1), Southside agreed to "[a]ssume all outstanding secured debt at Premier Bank in the amount of $203,902.93." On the same date, Scott McAtee, acting as vice-president of Southside and individually, together with

---

[2] A narrative of the transaction is described in Defendant's Exhibit H.

4

his wife acting individually, signed a promissory note to Premier Bank in the amount of $203,902.93. On January 4, 2011, the bank filed a UCC Financing Statement (Plaintiff's Exhibit 5) with the Iowa Secretary of State, identifying the equipment securing the loan.

Southside has continued to do business since 2011. According to McAtee, 35-40% of its work is agricultural, 50% is residential, and 10-15% is light industrial (such as foundations for small metal buildings). McAtee testified that Southside focuses on "simple, basic jobs." It runs just one crew and has a maximum of six employees, including three college students. McAtee estimated that 5% of his time is spent bidding jobs, but that 95% of the time he is doing physical "boots on" work.

## D. First Lawsuit

On March 14, 2011, the Funds filed a complaint against Custom Concrete Designs, Inc., seeking essentially the same relief being sought in the instant action.[3] Custom did not file an answer or other responsive pleading, and a default judgment was entered on June 21, 2011. The judgment granted the Funds "the auditing relief as requested in Plaintiff's Complaint."

On July 26, 2012, the Funds filed a motion to enforce the judgment. On November 14, 2012, the Court ordered Custom to "cooperate and submit all necessary paperwork and other documentation for the auditing relief as requested in plaintiff's Complaint, and the Judgment thereon." The Court warned Custom that failure to comply with its Order may subject Custom to a finding of contempt.

There was no further action in the first lawsuit, but the testimony at the trial in the instant action revealed that on June 13, 2013, a compliance examination was conducted on records produced by Custom at the law office of Francis Henkels.

---

[3] *See The Board of Trustees of Carpenters Fringe Benefit Funds of Illinois by Michael Kucharski, Administrative Manager v. Custom Concrete Designs, Inc.*, No. 2:11-cv-01007-EJM (N.D. Iowa).

5

### E. Contributions to the Funds

Deborah French, contributions and collections department manager at Independent Employee Benefits Corporation ("IEBC"), testified regarding the manner in which the benefit funds operate. Benefit funds are established pursuant to a Declaration of Trust.[4] Collective bargaining agreements ("CBAs") signed by individual employers require the employer to contribute to the funds at a rate established in the CBAs. That is, the rate will vary based on the local union, the location of the work, and the CBA. On August 10, 2004, Scott McAtee, acting as vice-president of Custom, signed a Memorandum of Agreement recognizing the Carpenters Union and agreeing to be bound by the terms of the various Trust Agreements. *See* Plaintiff's Exhibit 14.

In its capacity as a third-party administrator of the benefit funds, IEBC sends monthly remittance reports to the numerous employers covered by the CBAs and trust agreements. The employer must report the individuals and hours worked by jurisdiction, which then determines the hourly contribution rate required to be remitted to the funds. In approximately April or May, 2010, IEBC became aware that Custom was delinquent in sending its remittance reports. IEBC contacted the local union business agent and confirmed that there was covered work being performed. Accordingly, IEBC called for a compliance examination to be conducted by Romolo & Associates.

### F. Compliance Examination

Pat Jones of Romolo & Associates testified that he performed a compliance examination as part of the Funds claim against Custom.[5] On June 13, 2013, Jones went

---

[4] The Agreement and Declaration of Trust establishing the Carpenters Retirement Savings Fund of Illinois was introduced as Plaintiff's Exhibit 15, pp 1-59. The Agreement and Declaration of Trust establishing the Carpenters Pension Fund of Illinois is also found in Exhibit 15, pp 60-113.

[5] Notwithstanding the language employed in the first lawsuit, Jones emphasized that he did not perform an "audit." That is, he did not attempt to independently verify the
(continued...)

to the office of Southside's attorney and examined a box of documents which had been produced by Scott McAtee on behalf of Custom. The records included payroll records, W-2 forms, 1099 forms, and 941 forms. Jones examined the period from January 2008 through September 2010, when Custom stopped doing business. Jones compared the reported work performed with information obtained from the Funds regarding hours reported by Custom in its compliance reports. The results of Jones' examination were compiled in a report, which was introduced as Plaintiff's Exhibit 13.

In reaching a conclusion regarding the amount allegedly owed by Custom, Jones assumed that if an employee was a member of the Carpenters Union, then they were performing "covered work." In fact, Jones assumed that *all* of Custom's employees were performing covered work, unless he was provided with evidence to the contrary. For example, if a named employee was a member of the laborers union, then he would generally not be included in amounts owed to the Carpenters Funds. If an employer fails to produce evidence that an employee was not doing covered work, however, then Jones assumed that the work is covered by the CBA and would require contributions to the Funds.

Scott McAtee testified that when he was audited in 2007 and 2009, the examination took place in his home. On those occasions, he would simply tell the examiner if the employee was not a member of the Carpenters Union and was not performing covered work. According to McAtee, the examiner would then exclude those hours in determining Custom's obligation to the funds. McAtee did not attend the compliance examination on June 13, 2013, however, and did not provide Jones with any documentation identifying employees not performing covered work. Accordingly, Jones assumed that all employees

---

⁵(...continued)
accuracy of the information provided by Custom. Instead, he determined the amount owed to the Funds based on the documents provided.

identified in the payroll records and W-2 forms were performing covered work, thus triggering a contribution to the Funds.

Employing this methodology, Jones determined that Custom's unpaid contributions from January 1, 2008 to September 30, 2010 totaled $75,829.59. Accrued interest added $56,528.48, with a total amount due of $132,358.07. *See* Exhibit 13, p. 17. The calculations performed by Jones in reaching his conclusion are contained in a series of spreadsheets. *See* Exhibit 13, pp. 18-57.

In 2008, 2009, and 2010, some of Custom's employees were members of Carpenters Local 678. According to Note 6 of Jones' compliance report, in determining the amounts owed during that time, Jones distinguished between members of Local 678, non-union employees who were performing work during that time period, employees who were reported for dues checkoff only, and employees who were typically reported for dues only, but were not included in Custom's compliance reports. These four categories were identified by Jones in his report as 678-05831, 678-5831*, 678-5831#, and 678-5831+.

The first category of employees associated with Carpenters Local 678 are those who were working in 2010, but for whom compliance reports were not filed by Custom during the second and third quarters of 2010 (immediately prior to Custom going out of business). These employees were Derek Duehr, Scott McAtee, Kevin Phillips, and Patrick Smith. According to Jones' report, they worked a total of 2,107 unreported hours during those two quarters, earning $49,122.89. Jones calculated benefits contributions owed of $24,188.40, plus interest due of $14,358.26. *See* Exhibit 13, pp. 22-25. The amount shown on the summary spreadsheet, however, is $40,894.92, apparently representing additional interest and dues. *See* Exhibit 13, p. 21.

Also in 2010, Jones determined that additional contributions were required for work associated with Carpenters Local 308 and Carpenters Local 1260. The employees associated with these two Locals were Derek Duehr, Kevin Phillips, and Patrick Smith. Regarding Local 308, Jones concluded that Custom owed $3,956.46 for pension benefits,

8

plus $2,377.21 for interest, with a total due of $6,333.67. *See* Exhibit 13, pp. 18-20. Regarding Local 1260, Jones concluded that Custom owed $1,221.26 for pension benefits, plus $714.11 in interest, for a total of $1,935.37. *See* Exhibit 13, pp. 55-57.

Jones then considered non-union employees, which he identified as category 678-5831. In 2008 Custom did not report James Kearney, Tyler McAtee, and Ben Weinschenk on its compliance reports filed with the Funds. Jones determined that those three employees worked 663.5 hours in 2008, earning $8,457.25. While those three employees were not union members, Jones assessed Custom for various benefits, totaling $6,565.42, and calculated interest due of $6,514.28.[6] *See* Exhibit 13, pp. 27-30. Accordingly, the Funds assert that Custom owes $13,584.78 for these three employees in 2008. *See* Exhibit 13, p. 26.[7]

Similarly, Jones determined the amounts owed for work performed by Tyler McAtee and Kellen Nail in 2009. These non-union employees worked 124 hours and earned $1,326. Jones calculated the amount due from Custom for full benefits in 2009 was $1,300.43, plus interest due of $1,018.58. *See* Exhibit 13, pp. 31-34. Accordingly, the Funds claim the total amount due for these two employees in 2009 is $2,390.30. *See* Exhibit 13, p. 26.[8]

In 2010, Custom employed non-union workers Toby Decker, Tyler McAtee, Corey Olson, and Ryan Wernimont. They worked a total 646 hours and earned $7,280.50.

---

[6] Regarding non-union employees, Jones concluded that "[s]ince the type of work performed cannot be determined, all unreported hours for these employees have been shown as due herein." Compliance Report, Note 6 (Exhibit 13, p. 16).

[7] The total amount shown owed on page 26 is slightly higher than the amount shown on page 28, reflecting an increase in interest due from $6,514.28 to $6,765.63, and a "dues" assessment of $253.73.

[8] Again, the slight discrepancy can apparently be attributed to accruing interest, and a dues assessment.

9

Assessing the amounts owed for all benefits, Jones determined that Custom owed $7,393.22, plus interest of $4,236.97. *See* Exhibit 13, pp. 35-38. Accordingly, the Funds claim that Custom owes $11,973.96 for non-union workers in 2010. *See* Exhibit 13, p. 26.[9] According to the "summary" spreadsheet, the total amount owed by Custom for non-union workers in 2008, 2009, and 2010 is $27,949.04. *See* Exhibit 13, p. 26.

Jones conducted a similar analysis for two other categories of workers associated with Carpenters Local 678. For those workers who were reported on Customs' compliance reports for "dues checkoff only" (identified in Jones' report as 678-5831#), Jones determined the amount owed for all other benefits.[10] In 2008, these employees included Daniel Henneberry, Gerald Lange, Pat Murphy, and Zachary Thill. In 2009 and 2010, the only employee listed in this category was Zachary Thill. Jones' calculations in this regard may be found at pages 40-46 of Exhibit 13. According to the summary spreadsheet, the total amount owed by Custom for employees falling in this category is $43,541.62. *See* Exhibit 13, p. 39.

The workers in the final category identified by Jones are those who "were typically being reported for dues only," but were apparently unreported to the funds on Custom's compliance reports. In determining the amount owed, Jones included "all benefits as due under this Local code."[11] The only employees included in this category (identified by Jones in his report as 678-5831+) are Pat Murphy in 2008 and Zachary Thill in 2010. *See*

---

[9] Once again, the difference between the amount allegedly owed as reflected on pages 35-38 of Exhibit 13, and the amount shown on the summary for 678-5831* on page 26, is attributable to accruing interest and the assessment of dues.

[10] In his report, Jones concluded "[i]t is unclear why any of these men would not be due for all other benefits and therefore we have shown any unreported benefits as due for these employees herein." Compliance Report, Note 6 (Exhibit 13, p. 16).

[11] Compliance Report, Note 6 (Exhibit 13, p. 16).

Exhibit 13, pp. 47-54. In the summary spreadsheet for this category, Jones concluded that Custom owes $11,703.45. *See* Exhibit 13, p. 46.

In summary, in determining the amount allegedly owed by Custom, Jones identified six separate categories. Three of the categories (678-05831, 308-01394, and 1260-1390) relate to union workers performing covered work in the second and third quarters of 2010, but for whom Custom failed to file compliance reports. The fourth category (678-5831*) involves non-union workers, who Jones assumed were performing covered work and should have been included in compliance reports. The final two categories (678-5831# and 678-5831+) involve union workers who, for unknown reasons, were allegedly misreported on the compliance reports. In a spreadsheet identifying the "TOTAL SUMMARY OF AMOUNTS DUE," the report identifies the amounts allegedly owed, broken down by the type of benefit and by year. *See* Exhibit 13, p. 17. According to Jones, the delinquent contributions total $75,829.59, with interest due in the amount of $56,528.48, or a total due of $132,358.07.

In reviewing the summary spreadsheets for each category described by Jones in his report, the amount owed by category and year may be set forth in table form as follows:

| CATEGORY | 2008 | 2009 | 2010 | TOTAL |
|---|---|---|---|---|
| 5831 | --- | --- | 40,894.92 | 40,894.92 |
| 308 | --- | --- | 6,333.67 | 6,333.67 |
| 1260 | --- | --- | 1,935.37 | 1,935.37 |
| 5831* | 13,584.78 | 2,390.30 | 11,973.96 | 27,949.04 |
| 5831# | 39,188.10 | 2,720.93 | 1,632.59 | 43,541.62 |
| 5831+ | 962.40 | --- | 10,741.05 | 11,703.45 |
| TOTAL | 53,735.28 | 5,111.23 | 73,511.56 | 132,358.07 |

*See* Exhibit 13, pp. 21, 18, 55, 26, 39, and 46.

11

## IV. DISCUSSION

In the complaint, the Funds ask that pursuant to the "alter ego doctrine," judgment enter against Southside for amounts owed by Custom. Accordingly, it is necessary for the Court to determine whether Southside is liable for Custom's debt as its "alter ego," and, if so, the amount owed.

### A. Is Southside the Alter Ego of Custom?

Federal law requires that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Here, the Funds have filed a complaint pursuant to 29 U.S.C. § 1132, seeking enforcement of the terms of the Plan. The Funds argue that Southside is the alter ego of Custom and, therefore, is liable for Custom's debt to the Funds.

"[T]he alter ego doctrine as developed under corporate law provides that the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate a fraud." *Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997) (citing *In re B.J. McAdams, Inc.*, 66 F.3d 931, 937 (8th Cir. 1995)).[12] Here, the Court must determine whether the relationship between Southside and Custom is such that Southside is liable for amounts owed by Custom pursuant to the Plan.

---

[12] The Court in *Superior Gen. Contractors* made it clear that the more lenient alter ego doctrine for disregarding the corporate form developed under the National Labor Relations Act (NLRA) is not applicable to actions, such as the instant action, brought under § 502 of the Employee Retirement Income Security Act (ERISA). 104 F.3d at 1055.

12

As set forth above, from September 10, 2001 to September 2010 — when it stopped doing business — Custom was an Iowa corporation engaged in the business of concrete construction. Custom was solely owned by Scott McAtee and his wife, Jeni McAtee. Jeni McAtee held the title of president, and Scott McAtee held the title of vice-president. In September 2010, Custom stopped doing business.[13] Southside was incorporated on September 7, 2010. Like Custom, Southside is entirely owned by Scott McAtee and Jeni McAtee and is engaged in the business of concrete construction. Like Custom, Jeni McAtee is president of Southside and Scott McAtee is vice-president.

In a series of transactions on December 9, 2010, Southside obtained ownership of Custom's assets, and assumed responsibility for Custom's debt to the Bank. Ostensibly, Southside borrowed $203,902.93 from Premier Bank, paid that precise amount to Custom to purchase the trucks and equipment, and Custom then paid that amount to Premier Bank in satisfaction of Custom's outstanding loan. No money actually changed hands. It was entirely a paper transaction which transferred ownership of the trucks and equipment from Custom to Southside, while transferring responsibility for the Bank debt from Custom to Southside.

At the time of trial, Scott McAtee freely admitted that the termination of Custom and the formation of Southside was for the purpose of avoiding Custom's debt. McAtee conceded Custom owed the Funds for unpaid contributions, but believed the amount owed was approximately $30,000. Custom also owed concrete companies approximately $60,000 to $70,000 for materials. McAtee believed he could avoid both debts by walking away from Custom and starting over with Southside. (McAtee understood that he could not avoid the debt owed to the Bank, because it held a security interest in all of Custom's equipment.) McAtee testified that he was "looking at filing bankruptcy," but elected not

---

[13] Eventually, Custom was administratively dissolved by the Iowa Secretary of State.

to do so. According to McAtee, in "hindsight that's what I should have done." McAtee testified he did not file for bankruptcy because "I had a little pride left."

McAtee argues, among other things, that Southside is not Custom's alter ego because the business model used by Southside is significantly different. According to McAtee, when Custom ceased doing business in 2010, it was devoting 90% of its time to commercial work, 15% to decorative work, and only 5% to residential.[14] At its maximum, Custom had 15 to 20 employees and McAtee worked primarily as a manager. Some of Custom's employees were union members. On the other hand, Southside has a maximum of six employees, with McAtee serving as a working foreman. According to McAtee, 50% of Southside's work is residential, with 35-40% agricultural and 10-15% light industrial. Southside does not employee any union workers.

The Court is unpersuaded by McAtee's argument. McAtee testified that toward the end of 2009 and during 2010, there was less work, competitors were submitting lower bids, and he realized that Custom "could not survive." In 2010, Custom employed only four union workers, including McAtee himself. It employed four non-union workers, including McAtee's son and a few of his friends. After Southside was incorporated and Custom stopped doing business, McAtee continued with non-union workers.

It is clear — and McAtee freely admits — that the reason for incorporating Southside was to allow McAtee to "start over" unhindered by Custom's debts. Through a series of paper transactions, Custom's assets were transferred to Southside, and Southside assumed the debt owed by Custom to the Bank. Custom's remaining debts, including unpaid contributions owed to the Funds, were left unpaid. The Court believes that the death of Custom and the birth of Southside, orchestrated by McAtee, was simply a subterfuge to avoid Custom's legitimate debts. Southside has the same owners, the same

---

[14] As previously noted, the percentages given by McAtee total 110%.

officers, uses the same equipment, and is engaged in the same type of work as Custom, albeit on a smaller scale.

The facts in *Superior Gen. Contractors* are easily distinguishable from those in the instant action. There, the plaintiffs claimed that "New Bohnert" was the alter ego of Superior General and, therefore, was liable to four employee trust funds for unpaid contributions. In that case, however, Superior General operated from its own premises and had separate management. While Superior General did business with "Old Bohnert" and "New Bohnert," it was through a competitive bid process negotiated between the managers of the respective businesses. 104 F.3d at 1053. The Court concluded that "New Bohnert" was not an alter ego of Superior General. *Id.* at 1055.

The facts in this case more closely resemble those in *Local 513, Intern. Union of Operating Engineers v. Sunrise Const., Inc.*, 2009 WL 1955754 (E.D. Mo.). There, Sunrise Construction was bound by a collective bargaining agreement and a default judgment was entered against it for unpaid contributions. One of the principals in Sunrise Construction then organized a new company entitled Pavement Constructors, LLC (later renamed Diverse Construction Group, LLC). In finding the successor company liable, the Court noted that "[u]nder ERISA, one business entity is the alter ego of another if the two entities exist independently in form only, and those separate forms are used as a subterfuge to defraud, to justify a wrong, or to mislead or discourage pursuit of legal action." *Id.* at *1 (citing *Superior Gen. Contractors*, 104 F.3d at 1055). The two companies shared common ownership and management. The Court found that the new company was the alter ego of the old company and was, therefore, liable for the balance of the previous judgment against Sunrise Construction. *Id.* at *4.

"The essence of the alter ego test is whether, under all the circumstances, the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *In re B.J. McAdams, Inc.*, 66 F.3d at 937. Here, McAtee essentially rolled his business over into a new corporation in an attempt to continue to operate a concrete

15

construction company, while avoiding legitimate debts. McAtee wanted the benefits of bankruptcy protection, without the drawbacks. Under the circumstances in this case, neither the law nor equity permits this result. The Court finds that Southside is the alter ego of Custom and, therefore, is liable for contributions owed by Custom to the Funds.

## B. What Amount is Owed By Custom?

When a judgment is entered in favor of a fiduciary in an action brought to enforce contributions to a multiemployer plan pursuant to 29 U.S.C. § 1145, the court shall award the unpaid contributions, interest on the unpaid contributions, reasonable attorney's fees, and such other legal or equitable relief as the court deems appropriate. *See* 29 U.S.C. § 1132(g)(2). Here, the Funds seek contributions and interest totaling $132,358.07, plus audit fees in the amount of $1,972.75, and attorney fees. Because Southside is Custom's alter ego for these purposes, it is liable for Custom's debt to the Funds, and the Court must determine the amount owed.

As set forth above, Pat Jones of Romolo & Associates performed a compliance examination on June 13, 2013. At the time of trial, Jones testified regarding the contributions and interest owed. Southside did not offer any competing testimony, nor did it challenge the raw data, methodology, or conclusions reached by Jones, with one exception. Jones assumed that the non-union employees (which he identified as category 678-5831*) were performing work covered by the collective bargaining agreement, and he assessed contributions for that work. McAtee testified, however, that none of the non-union employees performed covered work. The Court concludes that the contributions and interest attributable to the non-union workers ($27,949.04) is not owed by Custom. Because Southside did not offer any evidence challenging the balance of Jones' conclusions, however, the Court finds that the remaining amount ($104,409.03) is owed by Custom and, therefore, owed by Southside.

In the Final Pretrial Order, the parties agreed that the Funds had incurred $1,972.75 in auditing fees and $11,512.76 in attorney's fees as of June 20, 2014. According to the

Final Pretrial Order, it was anticipated that further attorney's fees would be "incurred through the date of trial." The Court finds that Plaintiff is entitled to recover its attorney fees, including the additional fees associated with the trial and post-trial briefing.

In summary, the Court concludes that the amount owed for contributions and interest is $104,409.03, plus auditing fees of $1,972.75, plus attorney fees through June 20, 2014 of $11,512.76. Accordingly, the total amount owed is $117,894.54, not including additional attorney fees. The parties are instructed to meet and confer regarding Plaintiff's claim for attorney fees incurred after June 20, 2014. If the parties are able to reach an agreement, Plaintiff shall notify the Court of the amount agreed upon. If the parties are unable to reach an agreement in that regard, then Plaintiff may file a supplemental application for fees not later than November 17, 2014. The Court will enter final judgment after the issue of additional attorney fees has been resolved.

## V. RULING

The Court finds that Southside Concrete, Inc. is the alter ego of Custom Concrete Designs, Inc. for these purposes. Accordingly, Southside is liable to Plaintiff for Custom's unpaid contributions, together with interest, costs, and attorney's fees. The total amount owed — not including attorney fees incurred after June 20, 2014 — is One Hundred Seventeen Thousand Eight Hundred Ninety-Four Dollars and fifty-four cents ($117, 894.54). Not later than **November 17, 2014**, Plaintiff must notify the Court of an agreed amount for additional attorney fees, or file a claim with the Court regarding the requested additional attorney fees. Judgment in this case will not enter until after the issue of attorney fees has been resolved.

DATED this 6th day of November, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA